# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued May 9, 2005          Decided June 10, 2005
Reissued August 9, 2005

No. 04-5312

JOHN HAGELIN, ET AL.,
APPELLEES

v.

FEDERAL ELECTION COMMISSION,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 04cv00731)

---

*Richard B. Bader*, Associate General Counsel, Federal Election Commission, argued the cause for appellant. With him on the briefs were *David B. Kolker*, Assistant General Counsel, and *Erin K. Monaghan*, Attorney.

*Jason B. Adkins* argued the cause for appellees. With him on the brief were *Lynne Bernabei, Alan R. Kabat*, and *John C. Bonifaz*.

Before: EDWARDS, HENDERSON, and TATEL, *Circuit*

*Judges*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: During the run-up to the 2000 presidential election, the Commission on Presidential Debates ("CPD") excluded all third-party candidates from the live audience of the first debate. The excluded candidates complained to the Federal Election Commission, accusing the CPD of violating FEC regulations prohibiting debate-staging organizations from "endors[ing], support[ing], or oppos[ing] political candidates or political parties." Rejecting the complaint, the FEC found that the CPD acted not out of any preference for major-party candidates or animus toward third-party candidates, but rather because it feared one or more third-party candidates would disrupt the debate. Because we conclude that substantial evidence supports the FEC's decision, we reverse the district court's decision to the contrary and remand with instructions to enter judgment for the FEC.

## I.

Under the Federal Election Campaign Act ("FECA"), organizations that stage presidential and vice-presidential debates may accept corporate contributions, *see* 2 U.S.C. § 431(9)(B)(ii); 11 C.F.R. § 114.4(f), so long as they do not, in the words of the Federal Election Commission's ("FEC") implementing regulation, "endorse, support, or oppose political candidates or political parties," 11 C.F.R. § 110.13(a)(1). Since 1987, presidential and vice-presidential debates have been staged by the Commission on Presidential Debates. Formed by the Democratic and Republican parties, the CPD's co-chairs are Frank J. Fahrenkopf, Jr., former head of the Republican National Committee, and Paul G. Kirk, former head of the Democratic National Committee.

Under FECA, "[a]ny person who believes a violation of [the] Act . . . has occurred, may file a complaint" with the FEC. 2 U.S.C. § 437g(a)(1). After reviewing the complaint and providing an opportunity for a response, *id.*, the commissioners vote on whether they have "reason to believe" a violation has occurred, *id.* § 437g(a)(2). If four of the six commissioners find "reason to believe," the FEC begins an investigation. *Id.* But if no majority finds "reason to believe," the FEC dismisses the complaint, and the complainant may seek district court review of whether the dismissal is "contrary to law." *Id.* § 437g(a)(8).

Setting the stage for the issue before us, we begin with an earlier challenge to the CPD's handling of the 2000 debates. Only the two major party candidates—Vice President Al Gore and Governor George W. Bush—met the CPD's eligibility criteria for debate participation. Several third-party candidates complained to the FEC, arguing (among other things) that the CPD allowed the two major parties to control the debate, depriving third-party candidates of "extensive television exposure and media . . . coverage" and "send[ing] a signal that [the excluded candidates are] somehow less credible than the other two candidates invited to the debate." *See* Admin. Compl. MUR 4987 at 11 (hereinafter "Buchanan Admin. Compl.") (internal quotation marks omitted). In one of their complaints, the third-party candidates pointed out that the "CPD is currently, and has always been" chaired by the former chairmen of the RNC and the DNC, that "the CPD's Board of Directors is divided among representatives of the Democratic and Republican parties and includes elected officials from those parties," and that at its inception the Republican and Democratic Parties billed the CPD as a "'*bipartisan*' organization created 'to implement joint sponsorship of general election . . . debates . . . by the national Republican and Democratic Committees *between their respective nominees*.'" *Id.* at 14-15 (alterations and omissions in original) (quoting Joint Press Release, DNC and RNC (Feb. 18, 1987)). According to the complaint, this

major-party dominance of the CPD combined with the allegedly partisan nature of the eligibility criteria demonstrated that the CPD "endorse[d], support[ed], or oppose[d] political candidates or political parties," 11 C.F.R. § 110.13(a)(1), rendering it ineligible to stage debates and making illegal its receipt of corporate donations. *See* Buchanan Admin. Compl. at 11-13 (citing 2 U.S.C. §§ 431(4), 431(9), 441a, 441b, 434; 11 C.F.R. §§ 110.13, 114.4(f)); *see also* First Gen. Counsel's Report MURs 4987, 5004, 5021 at 5-6 (hereinafter "Buchanan Gen. Counsel's Report").

The FEC's General Counsel, whose report to the FEC customarily "provides the basis for [its] action," *see FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 38-39 n.19 (1981) ("*DSCC*"), and the "record on which [a court may] base a deferential" decision, *id.* (quoting *Democratic Senatorial Campaign Comm. v. FEC*, 660 F.2d 773, 777 n.23 (D.C. Cir. 1980) (per curiam)), found that the third-party challengers had failed to provide "evidence that the CPD is controlled by the DNC or the RNC," "that any officer or member of the DNC or the RNC is involved in the operation of the CPD," or "that the DNC and the RNC had input into the development of the CPD's candidate selection criteria for the 2000 presidential election cycle." Buchanan Gen. Counsel's Report at 15. The General Counsel therefore recommended that the FEC find "no reason to believe" that the CPD had violated FEC regulations. *See id.* at 18-19. The FEC adopted this finding, ending prospects for any further administrative action. *See* 2 U.S.C. § 437g(a)(8)(A).

The complainants sought review in the U.S. District Court for the District of Columbia. *See id.* Although the district court thought that "the evidence [plaintiffs] have marshaled in support . . . is not insubstantial" and that "the General Counsel's terse explanation could have been more clear and thorough," it nevertheless upheld the FEC, explaining that "in the absence of any contemporaneous evidence of influence by the major parties

5

over the 2000 debate criteria, the FEC found evidence of possible past influence simply insufficient to justify disbelieving the CPD's sworn statement" and, "under the extremely deferential standard of review . . . , the FEC is entitled to the benefit of the doubt." *Buchanan v. FEC*, 112 F. Supp. 2d 58, 72 (D.D.C. 2000). The FEC, the district court concluded, "did not abuse its discretion in finding . . . 'no reason to believe' that the CPD currently" is in violation of section 110.13(a)(1) of the FEC's regulations. *Id.* at 73.

This brings us, then, to the challenge now before us. Saying it feared that Green Party presidential candidate Ralph Nader and possibly other third-party candidates might disrupt the first debate, the CPD instructed its ticket takers to deny admission to all such candidates. To ensure that ticket takers would know whom to exclude, the CPD gave them a "face-book" that included photographs of third-party candidates.

Citing their exclusion from the debate audience and claiming they now had the "contemporaneous evidence" found missing in *Buchanan*, Nader and other third-party candidates again complained to the FEC. In their complaint, they reiterated the allegations, rejected in the *Buchanan* proceedings by the FEC in a ruling upheld by the district court, that the major parties control the CPD. They also argued that while the CPD facilitated campaigning by the major parties during the debates, it explicitly prohibited "'campaigning' by third-party candidates," including "the modicum of campaigning purportedly entailed in attending the debates." Admin. Compl. MUR 5378 at ¶ 10. In support of this allegation, they cited a deposition statement by CPD General Counsel Lewis Loss that the CPD's "concern was that if a third party candidate who had not qualified for participation in the debate went to the trouble to get a ticket and attended the debate that it would be for the purpose of *campaigning* in some way, which seemed to imply the potential for disruption." Loss Dep. at 100-01 (emphasis

added). Though neither FECA nor FEC regulations address the composition of debate audiences, the complainants argued that their evidence demonstrated the CPD's support of major-party candidates and its opposition to third-party candidates, making it ineligible to stage debates. *See* 11 C.F.R. § 110.13(a)(1). In addition to Nader, the complainants included his running mate, Winona LaDuke; John Hagelin, Natural Law Party presidential candidate; Patrick Buchanan, Reform Party presidential candidate; Howard Phillips, Constitution Party presidential candidate; and the Green Party of the United States, the Constitution Party, and the Natural Law Party. (Throughout this opinion, we shall refer to the complainants collectively as "Hagelin").

In its response to the Hagelin complaint, the CPD asserted that "Mr. Nader and his supporters engaged in conduct that reasonably led CPD to be concerned about the risk of disruption of the live debate." CPD Resp. at 4. Such conduct included large rallies "at which the rallying cry was 'Let Ralph Debate,'" public statements by Nader "strongly suggesting[] that he sought to disrupt the Boston debate," and protests and a break-in at the CPD's offices by Nader supporters. *Id.* In conclusion the CPD argued:

> [I]t is evident that the decision alleged in the complaint was made for the purpose of preventing disruption of the live international television broadcast of the debate. . . . Indeed, the very testimony cited in the complaint makes plain that the CPD, having determined the participants in its debates by lawful process . . . wished to take reasonable measures to ensure that the debate was not disrupted by . . . audience member[s] who had not properly qualified for inclusion in the debate as participants.

*Id.* at 5.

Considering these arguments, the FEC General Counsel

began by reiterating the FEC's view that the previously rejected evidence from the *Buchanan* proceedings failed to establish a "reason to believe" that the CPD was controlled by the two major parties and therefore declined to reconsider that evidence. First Gen. Counsel's Report MUR 5378 at 4 (hereinafter "Hagelin Gen. Counsel's Report"). Turning to the new allegations, the General Counsel stated:

> The issue presented by the complaint is not whether CPD's exclusion decision was a good one, or even whether its fears of disruption were well-founded. The issue is whether there is a sufficient basis to conclude the decision may have been animated by partisanship. There is not.

*Id*. at 7. As to the allegation that the CPD aimed to prohibit third-party "campaigning," the General Counsel explained that Hagelin had taken Loss's use of the word "campaigning" out of context, particularly given the "substantial information indicating that [CPD's] decision was based on concerns of potential disruption during live television broadcasts, not partisanship." *Id.* The FEC adopted the General Counsel's recommendation and dismissed the complaint.

Hagelin brought suit in the U.S. District Court for the District of Columbia, and the parties filed cross-motions for summary judgment. In a memorandum opinion, the court observed that the *Buchanan* court's affirmance of the FEC rested "in part" on the plaintiffs' concession that "they had no 'contemporaneous evidence'" of two-party influence over the CPD. *Hagelin v. FEC*, 332 F. Supp. 2d 71, 76-77 (D.D.C. 2004) (quoting *Buchanan*, 112 F. Supp. 2d at 72). Given the new evidence that the CPD excluded third-party candidates from the 2000 debates, the district court found the "FEC's dismissal . . . contrary to law because the FEC ignored record evidence that CPD's exclusion of third party candidates from the debates was unrelated to a subjective or objective concern of disruption, and was therefore partisan." *Id.* at 77. Although the district court

read the record as "support[ing] the idea that CPD excluded some candidates for fear that they would disrupt the debates," it found that the record did "not support the assertion that CPD feared disruption by *all* candidates excluded." *Id.* at 78. Evidence that the CPD never considered the threat of disruption by third-party supporters reinforced the court's conclusion that "the exclusion policy appears partisan on its face." *Id.* at 80. The district court accordingly granted summary judgment in part for Hagelin, reversing and remanding to the FEC on the issue of partisanship and denying Hagelin's motion on another matter not relevant to the issue before us. *Id.* at 82-83.

The FEC now appeals, arguing that the district court inappropriately substituted its view of the evidence for that of the Commission. Because the district court granted summary judgment, our review is de novo. *See AFL-CIO v. FEC*, 333 F.3d 168, 172 (D.C. Cir. 2003).

## II.

We may set aside the FEC's dismissal of a complaint only if its action was "contrary to law," *see* 2 U.S.C. § 437g(a)(8), e.g., "arbitrary or capricious, or an abuse of discretion," *Orloski v. FEC*, 795 F.2d 156, 161 (D.C. Cir. 1986). "Highly deferential, [the arbitrary and capricious] standard presumes the validity of agency action" and permits reversal "'only if the agency's decision is not supported by substantial evidence, or the agency has made a clear error in judgment.'" *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir. 2000) (quoting *Kisser v. Cisneros,* 14 F.3d 615, 619 (D.C. Cir. 1994)).

Hagelin urges us to apply a less deferential standard of review because the FEC held no evidentiary hearing. But we know of no case, nor has Hagelin cited one, suggesting that deferential review is appropriate only where the agency holds a hearing that includes live testimony and an opportunity for cross-examination, as Hagelin maintains. Indeed, with respect

to the FEC we have held just the opposite. *See Orloski*, 795 F.2d at 167 (applying an "extremely deferential standard" to the FEC's determination that a complaint failed to establish "reason to believe" (internal quotation marks omitted)).

In a footnote, Hagelin argues that the FEC's bipartisan character—it has always had three Democratic and three Republican commissioners—represents still another reason that "militates against treating the FEC with the same deference owed to a review of agency adjudicative decisions." Appellee's Br. at 8 n.2; *see also* 2 U.S.C. § 437c(a)(1) (mandating that "[n]o more than 3 [out of 6] members of the Commission . . . may be affiliated with the same political party"). Yet the Supreme Court has explained that the FEC is "precisely the type of agency to which deference should presumptively be afforded" because the FEC's bipartisan composition makes it especially fit to "decide issues charged with the dynamics of party politics." *See DSCC*, 454 U.S. at 37; *see also Common Cause v. FEC*, 842 F.2d 436, 448 (D.C. Cir. 1988) (holding that "[d]eference is particularly appropriate in the context of the FECA, which explicitly relies on the bipartisan Commission as its primary enforcer").

At oral argument, counsel for Hagelin explained that what he meant was that because the FEC is dominated by the two major parties, courts cannot trust it to deal fairly with third-party complaints. Assuming Hagelin properly raised this issue—which we doubt given the footnote's opacity—we see no basis for thinking that third-party complaints warrant more demanding review. To begin with, the FEC's bipartisan structure is but one of several reasons the Supreme Court cited in support of deferential review. As the Court explained, the FEC also merits deference because (1) "Congress has vested the Commission with 'primary and substantial responsibility for administering and enforcing the Act,'" including "'extensive rulemaking and adjudicative powers,'" (2) the FEC "is

authorized to 'formulate general policy with respect to the administration of this Act,'" and (3) the FEC has "'sole discretionary power' to determine in the first instance whether or not a civil violation of the Act has occurred." *DSCC*, 454 U.S. at 37 (citations omitted). Moreover, the arbitrary and capricious and substantial evidence standards seem to us fully adequate to capture partisan or discriminatory FEC behavior. If the FEC engages in "unjustifiably disparate treatment" of third parties as compared to major parties, those actions would "work[] a violation of the arbitrary-and-capricious standard." *See FEC v. Rose,* 806 F.2d 1081, 1089 (D.C. Cir. 1986).

## III.

On the merits, the FEC argues that the district court undertook the wrong analysis. "[T]he issue for the court . . . is not whether CPD's action was reasonably justified, but only whether the Commission's decision to credit CPD's claim that its subjective motivation was a fear of disruption, which even if unreasonable was not based upon partisan electoral concerns, was arbitrary and capricious." Appellant's Br. at 16. The FEC's point is well taken. The district court, stating that "the record does not sustain FEC's finding that CPD excluded each and every third party candidate[] from the 2000 debates for non-partisan reasons," *Hagelin*, 332 F. Supp. 2d at 78, concluded that "the exclusion policy appears partisan on its face," *id.* at 80. But given the deferential standard of review, the question before the district court—and now before us—is not whether the CPD provided sufficient reasons for its exclusion of each and every candidate, but rather whether substantial evidence in the record supports the FEC's finding that the CPD's exclusion of the third-party candidates was not partisan.

In his deposition, CPD co-chair Fahrenkopf testified that "it was a question of whether or not . . . based upon the statements [Nader] made, [he] would attempt to disrupt the debates. . . . I

was convinced that we just couldn't take the risk of that disruption. And that's why I supported the decision not to allow him in the room." Fahrenkopf Dep. at 42. Fahrenkopf also stated, "It was a question of what happens if Ralph Nader and/or Pat Buchanan show up with a ticket into the hall, what will we do?" *Id.* at 43. CPD General Counsel Loss testified that "the CPD had decided that Mr. Nader and third-party candidates more generally . . . would not be admitted into the debate hall . . . I want to be clear, we made a decision that was of general application to third-party candidates, but it really is the case that our focus was very much on the very concrete threat that we perceived Mr. Nader posed." Loss Dep. at 50. With this record before it, the FEC concluded that the CPD acted out of fear that Nader, and possibly Buchanan, would disrupt the debate. Given our highly deferential standard of review, we see no basis for questioning this conclusion.

Hagelin argues that because the Fahrenkopf and Loss statements reveal a concern only about Nader and Buchanan, partisanship, not fear of disruption, must have been the true motivation for excluding *all* third-party candidates. Yet like the district court, Hagelin fails to accord any weight to Loss's testimony that based on the fears about Nader, the CPD "made a decision that was of general application to third-party candidates." Loss Dep. at 50. To be sure, the FEC General Counsel never quoted Loss's statement, but his report cites relevant portions of the deposition and he obviously took the statement into account, for in his report he referred to the CPD's policy toward all third-party candidates. *See ACS of Anchorage, Inc. v. FCC*, 290 F.3d 403, 408 (D.C. Cir. 2002) (upholding agency order that failed to "explicitly invoke" an exception because the court could "reasonably discern the path from [the order's] reasoning and citations"). While the CPD may well have over-reacted by excluding *all* third-party candidates, that possibility hardly required the FEC to find that the CPD's actions amounted to "endors[ing], support[ing], or oppos[ing]

political candidates or political parties," 11 C.F.R. § 110.13(a)(1).

Hagelin insists that the CPD's failure to consider the potential for disruption by Nader supporters or supporters of other third-party candidates demonstrates that its true motivation was partisan. But just as the CPD's possible over-reaction—excluding all third-party candidates—does not compel a finding of partisanship, neither does the CPD's possible under-reaction, i.e., failing to exclude third-party supporters as well. In any event, "[t]he question we must answer . . . is not whether record evidence supports [Hagelin's] version of events, but whether it supports" the FEC's, *see Florida Mun. Power Agency v. FERC*, 315 F.3d 362, 368 (D.C. Cir. 2003), and here it does.

Hagelin relies heavily on Loss's statement that the CPD's "concern was that if a third party candidate who had not qualified for participation in the debate went to the trouble to get a ticket and attend the debate that it would be for the purpose of campaigning in some way, which seemed to imply the potential for disruption." Loss Dep. at 100-01. According to Hagelin, this statement demonstrates the CPD's interest in preventing third-party candidates from campaigning. As the FEC General Counsel pointed out in his report, however, such a reading not only ignores record evidence revealing the CPD's concern about debate disruption during live television coverage, but also over-emphasizes the word "campaigning" and disregards the remainder of the statement, which focuses on "the potential for disruption." Hagelin Gen. Counsel's Report at 7.

Lastly, Hagelin argues that the FEC improperly declined to revisit the evidence from the *Buchanan* proceedings. As Hagelin points out, in *Buchanan* the district court emphasized that the absence of "contemporaneous evidence of influence by the major parties over the 2000 debate criteria" led it to uphold the FEC's determination that the "evidence of possible past influence [was] simply insufficient." *See Buchanan*, 112 F.

Supp. 2d at 72. Hagelin reads this as having imposed upon the FEC an obligation to revisit *Buchanan* now that he has introduced "contemporaneous evidence" of the CPD's exclusion of all third-party candidates from the debate audience. But according to the FEC, Hagelin has still failed to produce what the court found wanting in *Buchanan*, i.e., "hard contemporaneous evidence that the CPD is being influenced by the two major parties now," *see id*. Given our conclusion that substantial evidence supports the FEC's finding that the CPD did not act in a partisan manner, we find no fault in the FEC's refusal to revisit the "evidence of possible past influence."

## IV.

Applying an appropriately deferential standard of review, we find the FEC's decision supported by substantial evidence and therefore not contrary to law. We reverse the district court's judgment and remand with instructions to enter judgment for the FEC.

*So ordered.*